1
2
3
4
5
6
7
8
                       UNITED STATES DISTRICT COURT
                 WESTERN DISTRICT OF WASHINGTON
9
                             AT TACOMA

10
11
STUDENT DOE 4,                                    CASE NO. 2:25-cv-00708-DGE

12
              Plaintiff,         ORDER ON MOTION FOR
     v.                                          TEMPORARY RESTRAINING
13
                         ORDER (DKT. NO. 3)
TODD LYONS et al.,
14
             Defendant.
15

16
## I      INTRODUCTION

17
     On September 22, 2022, Plaintiff—who is a citizen of China—was admitted to the

18
United States on an F-1 visa to attend the University of Washington ("UW") as an undergraduate

19
student. (Dkt. No. 3-1 at 1.) Plaintiff has remained in good standing at UW since beginning her

20
degree. (*Id.*) On April 8, 2025, UW informed Plaintiff that her record within the Student and

21
Exchange Visitor Information System ("SEVIS") maintained by Immigration and Customs

22
Enforcement ("ICE") had been terminated and was no longer in an active status. (*Id.*)

23
Specifically, the letter informed Plaintiff that both her SEVIS record and I-20 were terminated.

24

1    (*Id.*)  The purported reason for termination was Plaintiff's alleged failure to maintain her

2    nonimmigrant status based on a "criminal records check" and/or a visa revocation.  (*Id.* at 1–2.)

3         Plaintiff brings claims under the Administrative Procedures Act ("APA") and the Fifth

4    Amendment against the Secretary of Homeland Security and the Department, and the ICE Acting

5    Director (collectively, "Defendants").  (Dkt. No. 1 at 5–6, 13–16).  Plaintiff moves for a

6    Temporary Restraining Order ("TRO") enjoining Defendants from terminating her F-1 student

7    status under the SEVIS system and enjoining Defendants from taking enforcement action against

8    Plaintiff based on the termination.  (Dkt. No. 3 at 9.)  Because Plaintiff is likely to succeed in her

9    argument that Defendants' actions were arbitrary and capricious, and not in accordance with law,

10   the Court will grant the TRO.  *See* 5 U.S.C. § 706(2)(A).

11        This case is related to several other F-1 visa termination cases in this district, including

12   the first-filed case *Doe v. Noem*, No. 2:25-cv-00633-DGE, in which this court granted a TRO.  --

13   - F.Supp.3d ---, 2025 WL 1141279 (W.D. Wash. April 17, 2025.)  This order applies

14   substantially and builds on the same reasoning as the original *Doe* case.

15                           **II      BACKGROUND**

16   **A.  The F-1 Visa Program and SEVIS**

17        Pursuant to the Immigration and Nationality Act ("INA"), a foreign student may enter the

18   United States in a nonimmigrant status to complete a course of study at an approved educational

19   institution.  8 U.S.C. § 1101(a)(15)(F)(i); 8 C.F.R. § 214.2(f).  If approved, the State Department

20   will issue a visa allowing the student admission to the United States to pursue their course of

21   study.  *See* 22 C.F.R. § 41.61(b)(1).  If admitted, DHS may administratively designate the

22   student as an F-1 nonimmigrant classification.  8 C.F.R. § 214.1(a)(2).  A key component to

23   admission as an F-1 nonimmigrant student is the presentment of Form I-20, which is "issued in

24

the student's name by a school certified by the Student and Exchange Visitor Program (SEVP) for attendance by F-1 foreign students." 8 C.F.R. § 214.2(f)(1)(i)(A). The F-1 student's Form I-20 is endorsed at the time of entry into the United States and the F-1 student is responsible for "retain[ing] for safekeeping the initial form I-20 or successor form bearing the admission number and any subsequent form I-20 issued to them." 8 C.F.R. § 214.2(f)(1)(ii), (f) (2).

An F-1 student may remain in the United States for the duration of their studies so long as they continue to meet the requirements outlined in the regulations. 8 C.F.R. § 214.2(f)(5)(i) ("Duration of status is defined as the time during which an F–1 student is pursuing a full course of study at an educational institution certified by SEVP for attendance by foreign students"). If a student "fails to maintain a full course of study without the approval of a [Designated School Official ("DSO")] or otherwise fails to maintain status," they must depart the United States immediately or seek reinstatement.[1] 8 C.F.R. § 214.2(f)(5)(iv); *see also* 8 U.S.C. § 1184(a)(1). Work authorization for F-1 students is governed by 8 C.F.R. § 274.12(b)(6). The regulation specifies certain classes of noncitizens who are "authorized for employment with a specific employer incident to status or parole" and may work subject to any conditions of their

---

[1] A student may seek reinstatement by submitting an I-539, Application to Extend/Change Nonimmigrant status to United States Citizenship & Immigration Service ("USCIS") and a Form I-20 or a successor form indicating a DSO's recommendation for reinstatement. 8 C.F.R. § 214.2(f)(16)(i). Pursuant to the regulations, a district director "may consider" reinstatement if: (1) student has not been out of status for more than five months at the time of filing or the failure to seek reinstatement within five months was due to exceptional circumstances; (2) student "[d]oes not have a record of repeated or willful violations of DHS regulations; (3) student is pursuing or intending to pursue a full course of study at the school that issued the Form I-20 or successor form; (4) student has not engaged in unauthorized unemployment; (5) student is not deportable pursuant to § 237 of the INA; and (6) USCIS is satisfied the violation of status was beyond the student's control, or the "violation relates to a reduction in the student's course load that would have been within a DSO's power to authorize, and that failure to approve reinstatement would result in extreme hardship to the student." 8 C.F.R.§ 214.2(f)(16)(i)(A)–(F). USCIS's decision to deny reinstatement is unreviewable. *See* 8 C.F.R. § 214.2(f)(16)(ii).

1    nonimmigrant classification, without additional documentation from DHS.[2]  In other words, a

2    student who is maintaining status under 8 C.F.R. § 214.2(f) is eligible for employment consistent

3    with the terms described in that section.

4          A nonimmigrant student's legal status is governed by the F-1 visa system, which is

5    administered by ICE through its Student and Exchange Visitor Program (SEVP).  *Jie Fang v.*

6    *Dir. U.S. Immigr. & Customs Enf't*, 935 F.3d 172, 175 (3d Cir. 2019).  In turn, SEVIS is an

7    SEVP-managed internet system that tracks and maintains information on nonimmigrant students.

8    *See* 8 C.F.R. § 214.3(a)(l).  To implement the F-1 visa program, SEVP certifies participating

9    educational institutions, allowing those institutions to issue a Form I-20 in the student's name in

10   SEVIS.[3]  SEVP regulations also govern the termination of F-1 student status in SEVIS.  8 C.F.R.

11   § 214.2(f).  A student may fall out of F-1 status by: (1) failing to meet the regulatory

12   requirements for F-1 student status or (2) via an agency related termination of status.  8 C.F.R.

13   §§ 214.1(d), 214.2(f)(5)(iv).[4]  DHS can terminate an F-1 student's status in three ways: 1) by

14   revoking a previously authorized waiver under 8 U.S.C. § 1182(d)(3) or §1182(d)(4); 2) through

15   the introduction of a private bill in Congress to confer permanent resident status; or 3) if DHS

16   publishes a notification in the Federal Register, on the basis of national security, diplomatic, or

17

18

---

19   [2] That includes "[a] nonimmigrant (F–1) student who is in valid nonimmigrant student status and
     pursuant to 8 § C.F.R. 214.2(f)" is seeking (i) on campus employment, part time during the
20   academic year or full time when school is not in session, (iii) CPT programs as authorized by the
     DSO and I-20, (iv) OPT employment as designated on a form I-766, and (v) a student who is
21   seeking H-1B status and whose F-1 status has been extended in the interim  (*see* 8 C.F.R.
     §§ 212.2(h); 214.2(f)(5)(vi)).
22   [3] *Study in the States*, Dep't of Homeland Sec. (last accessed Apr. 16, 2025),
     https://studyinthestates.dhs.gov/site/about-sevis; 8 C.F.R. § 214.2(f)(1)(i)–(iii).
23   [4] The regulations detail circumstances under which the visa holder may be considered to fail to
     maintain status, including unauthorized employment, willful failure to provide truthful
24   information to DHS, or certain qualifying criminal convictions.  8 C.F.R § 214.1(e)–(g).

public safety reasons.  8 C.F.R. § 214.1(d).  DHS's ability to terminate an F-1 student's status is limited to the three ways enumerated in § 214.1(d).  *See Jie Fang*, 935 F.3d at 185 n.100.

## B. Defendants Terminate Plaintiff's Record in SEVIS

In September of 2022, Plaintiff was admitted to the United States on an F-1 visa to study as an undergraduate at UW.  (Dkt. No. 3-1 at 1.)  She was most recently admitted to the United Status on her F-1 visa on July 16, 2024, to continue her studies as a junior in college.  (*Id.*)  Prior to the notice of SEVIS termination, Plaintiff was taking classes towards her bachelor's degree and working as a student assistant in Housing and Food Services at UW.  (*Id.*)  On April 8, 2025, Plaintiff received an email from UW stating: "After reviewing UW's SEVIS immigration records, we have discovered that as of today, 4/08/2025, your SEVIS record and I-20 were marked as 'terminated by' the Student & Exchange Visitor Program.'"  (Dkt. No. 10-1 at 1.) The termination reason in SEVIS stated: "Otherwise failing to maintain status - individual identified in criminal records check and/or has had their VISA revoked."  (Dkt. No. 3-1 at 1–2.) Plaintiff also received a letter from Housing and Food Services, which stated: "We have been informed by International Student Services that your SEVIS record has been terminated, and you no longer have authorization to work on campus. This is to notify you that you are dismissed from your position as a Student Assistant with Housing & Food Services at the University of Washington, effective the date of this letter. We are taking this action because you currently do not have authorization to work in the U.S."  (Dkt. No. 10-3 at 1.)

On April 9, 2025, Plaintiff received an email from the United States Embassy in Beijing stating that her student visa had been revoked.  (Dkt. No. 10-2 at 1.)  The notice did not provide an explanation for the revocation.  (*Id.*)  The notice included a paragraph stating:

> Remaining in the United States without a lawful immigration status can result in fines, detention, and/or deportation. It may also make you ineligible for a future U.S. visa.

> Please note that deportation can take place at a time that does not allow the person being deported to secure possessions or conclude affairs in the United States. Persons being deported may be sent to countries other than their countries of origin.

(*Id.*)

Plaintiff states that: "[i]n May 2024, I was cited in connection with an incident at a Sephora store.  This matter did not result in a conviction, and was instead resolved civilly through a compromise of a misdemeanor in August 2024."  (Dkt. No. 3-1 at 3.)  Plaintiff attests that she has "not had any other involvement with law enforcement" during her time as a UW student.  (*Id.*)  Plaintiff has "always been in good standing at the university and [has] maintained [her] student status," she states.  (*Id.* at 1.)

As a result of the sudden SEVIS termination, Plaintiff lost her part time job at UW, which is "an important source of income for [her]."  (*Id.* at 3.)  Additionally, Plaintiff has been "overwhelmed by fear and anxiety" and has not "dared to leave her home, constantly worrying that [she] may be detained by immigration authorities."  (*Id.*)  She has a painful cavity in her tooth that requires dental treatment but is "too afraid to seek medical care given [her] immigration status and fear of encountering authorities."  (*Id.* at 4.)  She is "terrified" about the repercussions of losing her student status, which endangers her ability to complete her undergraduate program and subjects her to risk of detention and removal.  (*Id.* at 4.)

Plaintiff alleges multiple causes of action under the APA: arbitrary and capricious agency action, action in excess of statutory and regulatory authority, action without observance of procedure required by law, and action that is contrary to constitutional right.  *See* 5 U.S.C. §§ 706(2)(A), 706(2)(C), 706(2)(D), 706(2)(B).  (Dkt. No. 1 at 13–16.)  She further alleges a Fifth Amendment Procedural Due Process violation.  (*Id.* at 14.)  Plaintiff seeks a TRO and subsequently a Preliminary Injunction (PI) that declares the termination of her SEVIS status

1    unlawful, vacates the termination of the SEVIS status, and orders Defendants to immediately

2    restore her SEVIS record and status.  (*Id*. at 16.)

3                                        **III      LEGAL STANDARD**

4            Federal Rule of Civil Procedure 65(b) governs the issuance of a TRO.  "The legal

5    standard for a TRO is substantially identical to the standard for a preliminary injunction."

6    *Facebook, Inc. v. BrandTotal Ltd.*, 499 F. Supp. 3d 720, 732 (N.D. Cal. 2020).  To obtain

7    injunctive relief, the moving party must show: (1) a likelihood of success on the merits; (2) a

8    likelihood of irreparable harm to the moving party in the absence of preliminary relief; (3) that

9    the balance of equities tips in favor of the moving party; and (4) that an injunction is in the

10   public interest.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  Generally, a TRO

11   is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is

12   entitled to such relief."  *Id*. at 22.  The moving party has the burden of persuasion.  *Hill v.*

13   *McDonough*, 547 U.S. 573, 584 (2006).  "The third and fourth factors, harm to the opposing

14   party and the public interest, merge when the Government is the opposing party."  *Nken v.*

15   *Holder*, 556 U.S. 418 (2009).

16           The Ninth Circuit has also articulated an alternative "sliding scale" approach pursuant to

17   which the first and third *Winter* factors are analyzed on a continuum; under such standard, a

18   weaker showing on the merits, combined with a stronger demonstration on the balancing test,

19   might warrant preliminary injunctive relief, assuming the second and fourth *Winter* elements are

20   met.  *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131–1135 (9th Cir. 2011).

21   Under this "sliding scale" method, the movant need only raise "serious questions going to the

22   merits," but the balance of hardships must tip "sharply" in the movant's favor.  *Id.* at 1131–1132;

23   *see also Farris v. Seabrook*, 677 F.3d 858, 864 (9th Cir. 2012).

24

# IV    JURISDICTION

"Section 704 of the APA provides for judicial review of '[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court.'" *Int'l Bhd. of Teamsters v. U.S. Dep't of Transp.*, 861 F.3d 944, 952 (9th Cir. 2017) (quoting 5 U.S.C. § 704). As no statute authorizes judicial review over the termination of SEVIS records, the singular issue here is whether Defendants' termination of Plaintiff's SEVIS record was "final" agency action for which there was no other "adequate remedy." 5 U.S.C. § 704. *C.f. Cabaccang v. U.S. Citizenship & Immigr. Servs.*, 627 F.3d 1313, 1316 (9th Cir. 2010). For agency action to be deemed final, it must "mark the consummation of the agency's decision-making process" and "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–178 (1997) (internal quotation marks omitted).

As an initial matter, it is apparent that the termination of Plaintiff's SEVIS record is an agency action that implicates "rights and obligations" and may well result in "legal consequences." *Id.*; *see also Jie Fang*, 935 F.3d at 180. Next, the action appears to constitute the consummation of the agency's decimating process for two reasons. First, "there is no statutory or regulatory requirement that a student seek reinstatement" of student status in SEVIS, and even if a student attempts to pursue the administrative procedure for SEVIS reinstatement, there is no "mechanism to review the propriety" of the original termination. *Jie Fang*, 935 F.3d at 182; *see* 8 C.F.R § 214.2(f)(16)(ii) ("The adjudicating officer will update SEVIS to reflect USCIS' decision. If USCIS does not reinstate the student, the student may not appeal the decision."). Second, since neither immigration judges nor the BIA have the authority to review SEVIS termination or a USCIS denial of reinstatement, there is no proceeding in which a student

can contest the agency action at issue here. *Jie Fang*, 935 F.3d at 185.; *Ghorbani v. I.N.S.*, 686 F.2d 784, 791 (9th Cir.1982); *Tooloee v. I.N.S.*, 722 F.2d 1434, 1438–1439 (9th Cir. 1983). Thus, the termination of Plaintiff's F-1 student status in SEVIS was not "of a merely tentative or interlocutory nature," but rather a unilateral determination with immediate legal consequences over which Plaintiff has no ability to seek administrative review. *Bennett*, 520 U.S. at 177–178. Accordingly, the Court finds it has jurisdiction to proceed. *C.f. Jie Fang*, 935 F.3d at 182 ("[t]he order terminating these students' F-1 visas marked the consummation of the agency's decisionmaking process, and is therefore a final order").

## V      ANALYSIS

### A.  Plaintiff is Likely to Succeed in the Argument that Termination of Her SEVIS Record was Unlawful

Under the APA, a court shall "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Here, based on the limited record before the Court, Plaintiff has demonstrated a likelihood of success on two independent grounds under § 706(2)(A): that Defendants' termination of her SEVIS record was not in accordance with law, and that it was arbitrary and capricious.[5]

#### 1.  Not In Accordance with Law

##### i.      *Agencies Must Follow Their Own Regulations*

It is contrary to law for an agency to disregard its own regulations and policies. *See Nat'l Ass'n of Home Builders v. Norton*, 340 F.3d 835, 852 (9th Cir. 2003); *Wallace v. Christensen*,

---

[5] Because the Court finds that Plaintiff has established likelihood of success on her APA claim, the Court does not reach her Fifth Amendment Due Process claim at this time.

802 F.2d 1539, 1552 n.8 (9th Cir. 1986) (an agency is "bound by its own regulations so long as

they remain in force."). As the District of Columbia Circuit has explained:

> In a series of decisions, the Supreme Court has entertained challenges to agency actions that failed to conform to agency regulations. In *SEC v. Chenery Corp.*, 318 U.S. 80, 87–88 (1943), the Court held that an agency is bound to the standards by which it professes its action to be judged. In *Accardi,* a case involving a habeas challenge to the denial of suspension of deportation, the Court objected to the agency's 'alleged failure to exercise its own discretion contrary to existing valid regulations.'

*Lopez v. Fed. Aviation Admin.*, 318 F.3d 242, 246 (D.C. Cir. 2003), *as amended* (Feb. 11, 2003)

(quoting *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268, (1954)) (parallel

citation omitted). Moreover, "'a court's duty to enforce an agency regulation, while most

evident when compliance with the regulation is mandated by the Constitution or federal law,'

embraces as well agency regulations that are not so required." *Id.* at 247 (alterations omitted)

(quoting *United States v. Caceres*, 440 U.S. 741, 749 (1979)).

      The Ninth Circuit has affirmed that "[p]ursuant to the *Accardi* doctrine, an administrative

agency is required to adhere to its own internal operating procedures." *Church of Scientology of

California v. United States*, 920 F.2d 1481, 1487 (9th Cir. 1990); *see also United States v. Nixon*,

418 U.S. 683, 696 (1974*); Arizona Grocery Co. v. Atchison, T. & S. F. Ry. Co*., 284 U.S. 370,

389 (1932). Courts have framed the obligation for an agency to follow its own regulations as

deriving from § 706(2)(A) or other APA provisions. *See, e.g., Suncor Energy (U.S.A.), Inc. v.

United States Env't Prot. Agency*, 50 F.4th 1339, 1352 (10th Cir. 2022) (holding that EPA action

violated § 706(2)(A) because it ignored the agency's regulatory definition of "facility"); *Kidd v.

Mayorkas*, 734 F. Supp. 3d 967, 983–984 (C.D. Cal. 2024) (ICE policy of warrantless "knock

and talk" violated agency's regulations and thus § 706(2)(A)). Agencies must also adhere to

internal procedures designed to provide protections to individuals. *Morton v. Ruiz*, 415 U.S. 199,

235 (1974) ("Where the rights of individuals are affected, it is incumbent upon agencies to

follow their own procedures."); *see also Lopez*, 318 F.3d at 247; *Beshir v. Holder*, 853 F.Supp.2d 1, 11 (D.D.C. 2011) (DHS Secretary's discretion to issue procedural rule pausing processing of adjustment of status applications limited by regulation requiring adjudication in certain timeframe).

Accordingly, Defendants are bound to follow their own rules and regulations governing the proper termination of an F-1 student's record in SEVIS.

*ii.   Defendants Failed to Follow Their Own Regulations and Procedures*

As discussed *supra*, a student's record in the SEVIS system can be terminated either because the student fails to maintain status, or when the agency initiates a termination of status. 8 C.F.R. §§ 214.1(d); 214.2(f).  Plaintiff avers that she has remained in full compliance with her F-1 status (Dkt. No. 3-1 at 2) and Defendants have introduced no evidence to the contrary. Agency-initiated termination is governed by 8 C.F.R. § 214.1(d), which enumerates circumstances that result in termination:

> Within the period of initial admission or extension of stay, the nonimmigrant status of an alien shall be terminated by the revocation of a waiver authorized on his or her behalf under section 212(d)(3) or (4) of the Act; by the introduction of a private bill to confer permanent resident status on such alien; or, pursuant to notification in the Federal Register, on the basis of national security, diplomatic, or public safety reasons.

Defendants do not argue that any of these criteria are present here.

Additionally, Plaintiff's single misdemeanor is not a qualifying offense that could lawfully result in SEVIS termination.  DHS's regulations specifically explain what criminal activity results in failure to maintain status for a nonimmigrant:

> A condition of a nonimmigrant's admission and continued stay in the United States is obedience to all laws of United States jurisdictions which prohibit the commission of crimes of violence and for which a sentence of more than one year imprisonment may be imposed. A nonimmigrant's conviction in a jurisdiction in the United States for a crime of violence for which a sentence of more than one year imprisonment may be imposed

(regardless of whether such sentence is in fact imposed) constitutes a failure to maintain status under section 241(a)(1)(C)(i) of the Act.

8 C.F.R. § 214.1(g).  In Washington, a misdemeanor shoplifting charge may be penalized with up to 364 days in jail, or one day short of a year imprisonment.  *See* Wash. Rev. Code § 9A.56.050.  Additionally, a misdemeanor shoplifting charge likely does not qualify as a crime of violence.  *See Borden v. United States*, 593 U.S. 420, 427–430 (2021) (a "crime of violence" is an offense that has as an element of use, attempted use, or threatened use of physical force against another person or their property and excludes offenses committed with a mens rea of negligence or recklessness.).  To the extent that Defendants terminated Plaintiff's SEVIS record merely because their name appeared in a criminal records check, that is inconsistent with Defendants' own regulation, which renders the decision invalid under § 706(2)(A).  *See supra*.

Additionally, the revocation of Plaintiff's F-1 visa (Dkt. No. 1-2 at 1) does not provide grounds for the SEVIS termination.  Recall the distinctions between the F-1 visa and record in the SEVIS system.  *See supra,* Section II(A).  The former is necessary for admission to the United States, while the latter indicates maintenance of lawful status.  8 C.F.R. §§ 214.2(f)(1); 214.2(f)(5).  Congress has granted the Secretary of State and consular officers broad discretion to revoke nonimmigrant visas, and such a determination can only be challenged in removal proceedings.  8 U.S.C. § 1201(i).  But the State Department's own internal policy directs consular officers that "[u]nder no circumstances should you revoke a visa when the individual is in the United States." *See* 9 FAM 403.11-3(B). [6]  Since Plaintiff was already lawfully admitted to the United States, her admissibility should have no bearing on her continued lawful presence, and Defendants have identified no authority that permits them to terminate a SEVIS record on

---

[6] U.S. State Department, Foreign Affairs Manual (last updated Oct. 2, 2024) https://fam.state.gov/fam/09FAM/09FAM040311.html.

ORDER ON MOTION FOR TEMPORARY RESTRAINING ORDER (DKT. NO. 3) - 12

the basis of a visa revocation.  ICE's own internal policy guidance confirms that "[v]isa

revocation is not, in itself, a cause for termination of the student's SEVIS record."  *Policy*

*Guidance 1004-01—Visa Revocations*. [7]  Likewise, State Department guidance confirms that

after a nonimmigrant exchange student visa is revoked, "the visa is no longer valid for *future*

travel to the United States" but only "*after* the individual's departure from the United States,

sponsors should terminate his or her program status in SEVIS."  *Guidance Directive 2016-03 9*

*FAM 403.11-3 – Visa Revocation*. [8]

Defendants indicate they are unable to state whether termination of the SEVIS record

invalidates a student's nonimmigrant status.  This position is inconsistent with the regulatory

scheme.  First, the SEVIS system provides a school the means to report a student's compliance

with requirements for maintaining F-1 nonimmigrant status (as indicated on form I-20).  *See* 8

C.F.R. §§ 214.2(f)(1)(iii); 214.3.  If a SEVIS record is terminated, the school can no longer

report the student's compliance; DHS advises that "Once the student has been terminated you

will not be able to take any action on this student or print the student's record without requesting

reinstatement."[9]  Thus, the school and the student have no way of establishing the student

remains in valid nonimmigrant status.  Second, the SEVIS record termination means "a student

---

[7] *Policy Guidance 1004-01—Visa Revocations*, U.S. Immigration and Customs Enforcement, 3, (June 7, 2010) https://www.ice.gov/doclib/sevis/pdf/visa_revocations_1004_04.pdf.

[8] *Guidance Directive 2016-03 9 FAM 403.11-3 – Visa Revocation*, U.S. Dep't of State Bureau of Educational and Cultural Affairs Private Sector Exchange, 1–2, (Sept. 2, 2016) https://j1visa.state.gov//wp-content/uploads/2019/05/2016-03_GD_Visa_Revocation_FINAL_Sept_2016.pdf.

[9] U.S. Dep't Homeland Sec., *Study in the States: Complete Program* (July 17, 2024), https://studyinthestates.dhs.gov/sevis-help-hub/student-records/completions-and-terminations/complete-program

1   loses all on- and/or off-campus employment authorization."[10]  But cancellation of employment

2   authorization can only mean that a student has failed to maintain status and therefore is no longer

3   in nonimmigrant status.  *See* 8 C.F.R. § 214.2(f)(9)(ii)(A) ("The employment authorization is

4   automatically terminated whenever the student fails to maintain status."); 8 C.F.R.

5   § 274a.12(b)(6) (identifying that a nonimmigrant F-1 student who is in valid nonimmigrant status

6   is authorized for employment).  Thus, it is inconsistent for the government to acknowledge it

7   terminated Plaintiff's SEVIS record while failing to acknowledge it has terminated Plaintiff's

8   lawful nonimmigrant status.  To the extent the Government admits to terminating the SEVIS

9   records of students who have properly maintained their status, that would be a misuse of the

10   system and contrary to the relevant regulations.

11          Accordingly, termination of the SEVIS record because of the misdemeanor charge is

12   inconsistent with agency regulations, which renders the decision invalid.  *Nat'l Ass'n of Home*

13   *Builders*, 340 F.3d at 852; *Wallace*, 802 F.2d at 1552 n.8.  Because Defendants' termination of

14   Plaintiff's SEVIS record was—based on the limited information currently available—not

15   authorized by and violated their own regulations, Plaintiff is likely to succeed in the argument

16   that the agency action is not in accordance with law under § 706(2)(A).

17          2. Arbitrary and Capricious for Lack of Explanation

18          Agency action is considered arbitrary and capricious if "the agency has relied on factors

19   which Congress has not intended it to consider, entirely failed to consider an important aspect of

20   the problem, offered an explanation for its decision that runs counter to the evidence before the

21   agency, or is so implausible that it could not be ascribed to a difference in view or the product of

22

23   [10] U.S. Dep't Homeland Security, *SEVIS Help Hub: Terminate A Student* (Nov. 7, 2024.)
     https://studyinthestates.dhs.gov/sevis-help-hub/student-records/completions-and-
24   terminations/terminate-a-student.

ORDER ON MOTION FOR TEMPORARY RESTRAINING ORDER (DKT. NO. 3) - 14

agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). As the Ninth Circuit has explained, the "critical factor in *Motor Vehicle* was that the agency 'submitted no reasons at all' for its decision." *McFarland v. Kempthorne*, 545 F.3d 1106, 1113 (9th Cir. 2008) (citing *Motor Vehicle*, 463 U.S. at 50). The *Motor Vehicle* standard has been applied to review individualized agency decisions as well as agency rules. *See, e.g.*, *Does 1 through 16 v. U.S. Dep't of Homeland Sec.*, 843 F. App'x 849, 852 (9th Cir. 2021); *McNeely v. United States Dep't of Lab.*, 720 F. App'x 825, 827 (9th Cir. 2017).

In this instance, Defendant has failed to meet "the general administrative-law requirement that an agency 'articulate a satisfactory explanation for its action.'" *Hernandez v. Garland*, 52 F.4th 757, 768 (9th Cir. 2022) (quoting *State Farm*, 463 U.S. at 43). Indeed, Defendant has failed to suggest any lawful grounds as to why its action here is lawful under the APA. *Motor Vehicle*, 463 U.S. at 50. Defendants' submission that they "do not concede that Doe #4 has demonstrated a likelihood of success on the merits on her APA claim" but cannot defend it because "DHS and from the Department of State, and Defendants have not completed [factfinding] efforts in time to respond to Doe #4;s motion" is inadequate under governing law. (Dkt. No. 8 at 10.) *C.f. Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 30 (2020).[11] The Court declines to "deny Doe #4's motion even in the absence of this factual information related to the APA claim." (*Id.*) Indeed, Defendant's failure to provide a single plausibly lawful explanation for its action—an explanation reasonably grounded somewhere in the statutory scheme—is the exact circumstance contemplated by the arbitrary and capricious

---

[11] An agency need not consider every conceivable alternative, but when it is "not writing on a blank slate" it must consider the impact of its actions on vested reliance interests, especially in the immigration context, where individuals make "time-bounded commitment[s], to allow them to, say, graduate from their course of study." *Regents*, 591 U.S. at 32–33.

1    standard. *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 968 (9th Cir. 2015) (en

2    banc) ("[*Motor Vehicle*] teaches that even when reversing a policy after an election, an agency

3    may not simply [change courses] without a reasoned explanation.").

4          Accordingly, Plaintiff is also likely to prevail on the claim that the agency action is

5    arbitrary and capricious for failing to "articulate a satisfactory explanation for its action

6    including a rational connection between the facts found and the choice made." *Motor Vehicle*,

7    463 U.S. at 43.

8          **B. Remaining TRO Factors**

9            1. <u>Irreparable Harm</u>

10         Plaintiff faces several forms of irreparable harm as the result of the termination of her

11   SEVIS record. First, the termination of her F-1 status in SEVIS will prevent Plaintiff from

12   finishing a four-year undergraduate degree that she is approximately one year away from

13   completing. (Dkt. No. 3-1 at 1.) Additionally, the sudden loss of Plaintiff's on campus

14   employment jeopardizes her ability to pay her rent and tuition. (*Id.* at 2.) She is also suffering

15   extreme emotional stress that is impacting her physical health. (*Id.* at 3–4.) What is more, while

16   Defendants have not yet placed Plaintiff in removal proceedings, she faces the prospect of

17   detention, removal proceedings, and ultimately removal because termination of her SEVIS

18   record indicates that she is not maintaining status in her program. *See* 8 U.S.C. § 1227(a)(1)(B)

19   (a person who is not lawfully present is removable). Plaintiff's fears are not speculative, as

20   DHS's own public-facing guidance states that a person whose SEVIS record is terminated faces

21   the following consequences:

22         • Student loses all on- and/or off-campus employment authorization.

23         • Student cannot re-enter the United States on the terminated SEVIS record.

24

- Immigration and Customs Enforcement (ICE) agents may investigate to confirm the departure of the student.

- Any associated F-2 or M-2 dependent records are terminated. [12]

Importantly, as indicated above, termination revokes all employment authorization and provides ICE agents a basis to investigate a student's departure, which could only mean the student no longer maintains lawful status in the United States otherwise why the need to confirm their departure.

Turning now to examine each irreparable harm in more detail, the Court first concludes—as many courts have before—that interruption of educational programs or progress can constitute irreparable harm. For example, in *Tully v. Orr*, the court held that disenrolling a cadet from the United States Air Force Academy "just prior to his examinations and graduation" would be an irreparable harm where the cadet would face the prospect of having to repeat courses, "delay[] in both his graduation and commissioning," and a "deleterious effect" on his future in the force. 608 F. Supp. 1222, 1225, 1226 (E.D.N.Y. 1985). In similar proceedings across the country, courts have found that "[t]he loss of timely academic process alone is sufficient to establish irreparable harm" where the termination of F-1 student status in SEVIS will likely prevent the student from completing their degree program. *Isserdasani v. Noem*, No. 25-CV-283-WMC, 2025 WL 1118626, *5 (W.D. Wis. Apr. 15, 2025); *see also B K v. Noem*, No. 1:25-CV-419, 2025 WL 1171572 (W.D. Mich. Apr. 23, 2025) ("The loss of timely academic progress, whether such progress is accomplished in preparing a dissertation or gaining practical work experience, is simply not compensable by money damages"); *Doe, v. Noem*, No. 3:25-CV-00023, 2025 WL

---

[12] *See* Dep't Homeland Security, *SEVIS Help Hub: Terminate A Student* (Nov. 7, 2024.) https://studyinthestates.dhs.gov/sevis-help-hub/student-records/completions-and-terminations/terminate-a-student.

1161386, *6 (W.D. Va. Apr. 21, 2025); *Yang v. Noem*, No. 25-CV-292-WMC, 2025 WL

1166521, *4 (W.D. Wis. Apr. 22, 2025) ("Given the amount of Yang's educational expenses and

potential losses from having to leave the United States without obtaining her degree, the court

concludes that Yang credibly demonstrates that she faces irreparable harm for which she has no

adequate remedy at law in the absence of injunctive relief"); *Ratsantiboon v. Noem*, No. 25-CV-

01315 (JMB/JFD), 2025 WL 1118645, *2 (D. Minn. Apr. 15, 2025); *Patel v. Bondi*, No. 1:25-

CV-00103, 2025 WL 1158708, *2 (W.D. Pa. Apr. 21, 2025); *Saxena v. Noem*, No. 5:25-CV-

05035-KES, 2025 WL 1149498, *2 (D.S.D. Apr. 18, 2025); *Chen v. Noem*, No. 25-CV-03292-

SI, 2025 WL 1150697, *5 (N.D. Cal. Apr. 18, 2025). Here, as in those cases, the termination of

Plaintiff's student status places nearly three years of hard work towards her undergraduate

degree in jeopardy.

        Likewise, under circumstances where a plaintiff's work and lawful immigration status are

interlinked, courts have held that the loss of work authorization is irreparable harm. *See Casa de*

*Maryland, Inc. v. Wolf*, 486 F. Supp. 3d 928, 968 (D. Md. 2020), *order dissolved sub nom. Casa*

*de Maryland, Inc. v. Mayorkas*, No. 8:20-CV-2118-PX, 2023 WL 3547497 (D. Md. May 18,

2023) (a delay in an asylum seeker obtaining work authorization is an irreparable harm because

"every additional day these individuals wait will visit[] on them crippling dependence on the

charity and good will of others"); *Batalla Vidal v. Nielsen*, 279 F. Supp. 3d 401, 434 (E.D.N.Y.

2018), *vacated and remanded sub nom. Dep't of Homeland Sec. v. Regents of the Univ. of*

*California*, 591 U.S. 1 (2020) (finding that if the DACA program were terminated, resulting loss

of work authorization for DACA recipients would be an irreparable harm). As another court in

similar proceedings recently explained: "as a result of the SEVIS termination, [the plaintiff] is no

longer authorized to engage in on-campus employment"—the only potential source of

1   employment for F-1 visa holders, who cannot generally work off campus.  *Oruganti v. Noem*,

2   No. 2:25-CV-00409-ALM-EPD, 2025 WL 1144560, *4 (S.D. Ohio Apr. 18, 2025).  Although

3   this represents economic harm, "it is irreparable because money damages are likely not

4   available" in APA cases like this one.  *Id.* (collecting cases).

5          Next, the Court considers the threat of removal.  Removal is not by itself an irreparable

6   harm, in part because removal is (in at least some instances) reversible.  *See Nken*, 556 U.S. at

7   430.  However, in this case, the ordinary harms of removal would compound the other harms

8   Plaintiff faces by effectively eliminating her ability to complete her degree program, placing her

9   education, financial stability and career trajectory in jeopardy.  Courts across the country have

10  come to the same conclusion.  *See, e.g., B.K. v. Noem*, No. 1:25-CV-419, 2025 WL 1171572

11  (W.D. Mich. Apr. 23, 2025), *Hinge v. Lyons*, No. CV 25-1097 (RBW), 2025 WL 1134966, *5

12  (D.D.C. Apr. 15, 2025). Although Plaintiff could perhaps hypothetically transfer her coursework

13  credits to an academic institution in another country, "Plaintiffs are not required to eliminate all

14  alternative [] paths in order to meet their burden under this factor."  *B.K.,* 2025 WL 1171572, at

15  *8.

16         Finally, Plaintiff describes severe psychological distress, including such a profound fear

17  of leaving her home that she is foregoing necessary medical treatment.  (Dkt. No. 3-1 at 4.)  She

18  is "overwhelmed by fear and anxiety" and "cr[ies] frequently."  (*Id.*)  The Ninth Circuit has

19  found that emotional distress, depression, and anxiety constitute irreparable harm under certain

20  circumstances.  *Chalk v. U.S. Dist. Ct. Cent. Dist. of California*, 840 F.2d 701, 709–710 (9th Cir.

21  1988).  In *Chalk*, the plaintiff was a teacher of hearing-impaired children. After he developed

22  AIDS, the school board removed him from the classroom and assigned him to administrative

23  tasks despite his presentation of evidence that his presence in the classroom posed no danger to

24

the students.  *Id*. at 703.  The Ninth Circuit granted a preliminary injunction, finding that the Plaintiff's "injury [was] emotional and psychological—and immediate. Such an injury cannot be adequately compensated for by a monetary award after trial."  *Id*. at 710.

While "the emotional distress normally suffered upon the loss of a job will not support the issuance of preliminary relief," the emotional and psychological distress triggered by the loss of one's undergraduate degree, employment, and living circumstance is both unusual and extreme.  *Remlinger v. State of Nev*., 896 F. Supp. 1012, 1017 (D. Nev. 1995).  Moreover, as other courts have commented, the fear of removal is significant—and not ill-founded—in these cases.  *See Madan*, 2025 WL 1171572, citing *Ozturk v. Trump*, No. 25-CV-10695-DJC, 2025 WL 1009445, at *1 (D. Mass. Apr. 4, 2025) ("[W]ithout prior notice of the revocation of her student visa or the grounds asserted for same, Ozturk, a graduate student in Child Study and Human Development at Tufts University, was approached and surrounded by six officers (several wearing masks and/or hoods), stripped of her cellphone and backpack, handcuffed, and taken into custody in an unmarked vehicle.").  Accordingly, this case bears a stronger similarity to instances where courts have found that emotional harm constitutes irreparable harm than to "run of the mill" job loss cases.  *See, e.g., EEOC v. Chrysler Corp*., 546 F. Supp. 54, 70 (E.D. Mich. 1982) aff'd, 733 F.2d 1183 (6th Cir.1984); *Shapiro v. Cadman Towers, Inc*., 844 F. Supp. 116, 122 (E.D.N.Y. 1994); *Caspar v. Snyder,* 77 F. Supp. 3d 616, 640 (E.D. Mich. 2015); *United States v. Matusoff Rental Co*., 494 F.Supp.2d 740, 756 (S.D. Ohio 2007).  Thus, the Court concludes that extreme psychological distress caused by the termination of Plaintiff's student status may well represent an irreparable injury for which "there can be no do over and no redress." *Nat'l Council of Nonprofits*, ___ F. Supp. 3d ___, ___, 2025 WL 368852, at *13 (quoting *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016)).  When

1    taken in combination, the harm threatened to Plaintiff is substantial: loss of employment

2    authorization, loss of undergraduate degree, loss of job prospects, life under the threat of

3    immediate removal, and extreme psychological distress.

4        2.    There is a Public Interest in Enforcement of Valid Regulations, and Balance of
              Equities Favor Plaintiff

5        "When the government is a party, the balance of equities and the public interest factors

6    merge." *Nken*, 556 U.S. at 435. The public has a vested interest in a federal government that

7    follows its own regulations. As one court framed it: "the public has a strong interest in having a

8    [government] that conducts itself fairly and according to its stated regulations and policies."

9    *Cooney v. Dalton*, 877 F. Supp. 508, 515 (D. Haw. 1995); *see also Eight N. Indian Pueblos*

10   *Council, Inc. v. Kempthorne*, No. CV 06-745 WJ/ACT, 2006 WL 8443876, *5 (D.N.M. Sept. 15,

11   2006) ("It is in the public interest that federal agencies comply with their own policies and with

12   federal statutes."). Here, Defendants assert that the public interest factors tip in their favor

13   because the "public interest lies in the Executive's ability to enforce U.S. immigration laws."

14   (Dkt. No. 8 at 11.) However, Defendants have provided *no indication* that they complied with

15   the relevant statutory scheme in enforcing immigration laws in this case. Accordingly, this is a

16   set of circumstances where the government and its decision-making processes will be best served

17   by judicial review of a decision—and maintenance of the status quo during that review—that

18   appears both unlawful and likely to cause Plaintiff irreparable harm. Moreover, Defendants have

19   not put forth evidence of how a TRO would cause them injury or harm. For these reasons, the

20   Court determines that the balance of the equities and public interest factors tip sharply in

21   Plaintiff's favor.

22       Finally, the Court addresses Defendant's argument that Plaintiff is "not only seeking to

23   preserve the status quo on a temporary basis" but is rather requesting "an order compelling the

ORDER ON MOTION FOR TEMPORARY RESTRAINING ORDER (DKT. NO. 3) - 21

defendants to change the status quo" because "she seeks emergency restoration of a record that
has already been marked as terminated." (Dkt. No. 8 at 6.)  Courts have long held that the "status
quo ante litem" for the purposes of considering a temporary restraining order or preliminary
injunction "refers not simply to any situation before the filing of a lawsuit, but instead to 'the last
uncontested status which preceded the pending controversy.'"  *GoTo.com, Inc. v. Walt Disney
Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000) (quoting *Tanner Motor Livery, Ltd. v. Avis, Inc.*, 316
F.2d 804, 809 (9th Cir. 1963).  An interpretation of "status quo as the moment before filing a
lawsuit but after alleged misconduct began "would lead to absurd situations, in which plaintiffs
could never bring suit once infringing conduct had begun." *Id*.

This standard has been applied to government action as well as private disputes.  *See,
e.g., Doe #1 v. Trump*, 957 F.3d 1050, 1068–1069 (9th Cir. 2020); *S.A. v. Trump*, No. 18-CV-
03539-LB, 2019 WL 990680, *13 (N.D. Cal. Mar. 1, 2019).  For example, in *S.A.*, the court
concluded that the status quo ante litem was the point before DHS stopped processing
conditionally approved beneficiaries under a dual refugee/parole program.  *See S.A.,* 2019 WL
990680, at *13.  Accordingly, the court vacated DHS's decision to mass-rescind conditional
approvals for 2,714 beneficiaries pending a final determination on the merits because that
maintained the status quo ante litem.  *Id*. at *17.  Similarly, in this case, the "legally relevant
relationship between the parties before the controversy arose," describes the state of affairs *prior*
to the termination of Plaintiff's SEVIS record.  *Ariz. Dream Act Coalition v. Brewer*, 757 F. 3d
1053, 1060–1061 (9th Cir. 2014).  Accordingly, Defendant's argument that "the relief Doe seeks
is not a prohibitory injunction to maintain the status quo" is frustrated by decades of Ninth
Circuit caselaw.  (Dkt. No. 8 at 2.)

Finally, Defendant advances a confused argument that posits Plaintiff seeks "a final judgement on the merits" because a TRO is part of the final relief outlined in her complaint. (*Id.*)  Defendants are correct that "it is generally inappropriate for a federal court at the preliminary-injunction stage to give a final judgment on the merits." *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).  But what the *Camenisch* court was communicating was that findings of fact and conclusions of law made by a court in a preliminary injunction or TRO posture are preliminary and do not bind the court at the trial on the merits.  *Id.* at 395–398.  Thus, it is not appropriate to enter a *final judgement* at a TRO stage.  *Id.*  That is not what the Court is doing here.  As the *S.A.* court emphasized, "nothing in *Camenisch* holds that the scope of a preliminary injunction cannot overlap with the relief requested for an eventual final judgment." S.*A*, 2019 WL 990680, at *16 n.59.  Here, as in *S.A.*, the order makes no final findings on the merits and merely returns the parties to the status quo ante litem.

Here, as in *S.A.*, the order makes no final findings on the merits and merely returns the parties to the status quo ante litem.

**C.  The Court Will Not Require a Bond**

Under Federal Rule of Civil Procedure 65(c), in granting a PI or TRO, the court must require a movant to pay security "in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  The Ninth Circuit has held that "[d]espite the seemingly mandatory language, Rule 65(c) invests the district court with discretion as to the amount of security required, *if any.*" *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (quoting *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003)) (cleaned up).  "In particular, '[t]he district court may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining her or

her conduct.'" *Id.* (quoting *Jorgensen,* 320 F.3d at 919).  Here, Defendants request that the Court impose a bond "in an amount the Court determines to be appropriate."  (Dkt. No. 12 at 10.) Defendants do not account for any costs they allege they will face if the TRO is issued erroneously, and the Court perceives none.  Here, Defendants will face no cost from Plaintiff continuing her studies as she did before her SEVIS was terminated, and negligible or zero cost from restoring her SEVIS status to active.  Plaintiff's only criminal history is a misdemeanor, and she poses little if any risk to the public.  The Court therefore exercises its discretion to waive the bond requirement.

## VI     CONCLUSION

Accordingly, it is ORDERED that Plaintiff's Motion for a Temporary Restraining Order (Dkt. No. 3) is GRANTED.  Defendants are ENJOINED for a period of fourteen days from the date of this order, as follows:

1) Defendants shall restore Plaintiff's F-1 student record and I-20 in the Student and Exchange Visitor Information System (SEVIS);

2) Defendants shall set aside the April 8, 2025 F-1 student record and I-20 termination as to Plaintiff;

3) Defendants shall not terminate Plaintiff's student record and I-20 in SEVIS absent a valid ground as set forth in 8 C.F.R. §§ 214.1(d)–(g); 214.2(f).

4) Defendants are prohibited from detaining or transferring Plaintiff out of this Court's jurisdiction, or ordering the detention or transfer of Plaintiff out of this Court's jurisdiction, as a result of the termination of her F-1 student record or I-20 in SEVIS on April 8, 2025; and

5) Defendants are prohibited from initiating removal proceedings against or deporting Plaintiff on the basis of the April 8, 2025 termination of her F-1 student record or I-20 in SEVIS.

It is furthered ORDERED that the security requirement of Rule 65(c) is waived.  The Court ORDERS the Parties to appear for a Preliminary Injunction hearing at 1:30 p.m. PT on May 7, 2025.

Dated this 25th day of April, 2025.

David G. Estudillo
United States District Judge

ORDER ON MOTION FOR TEMPORARY RESTRAINING ORDER (DKT. NO. 3) - 25